Thank you, Your Honor. Good morning, and may it please the Court, I'm Scott McElroy from the Navajo Nation. I'm going to take just five minutes for a lot of what's possible. Okay. This case arises out of two different and distinct responsibilities that the federal government has on the West. It's pretty particular on the control of the federal government, but in the end, the federal defendants, principally acting through the Secretary of the Interior, have obligations with the Department of State to be acting for the river in the Boulder Basin. The RA comes from the Boulder Canyon Project Act and the, excuse me, decree in Arizona v. California. The other obligation that the United States has is its trust responsibilities to the Navajo Nation and other Indian tribes. The Navajo Nation, the Navajo Reservation, I should say, is on the banks of the Lower Basin, the Summerwater River, as well as the Upper Basin. It is an extensive area. The reservation itself crosses numerous states as it exists to numerous supplies of water, but we contend needs water from the Colorado River to meet its basic purpose as a permanent homeland for the Navajo people. We have two fundamental complaints in this case. One arises under NEPA. One arises under what we believe are the trust responsibilities of the United States. With regards to the NEPA claim, we challenged the management decisions made by the Secretary of the Interior, the so-called surplus pipelines, which were issued in 2001, and we also challenged the shortage pipelines, which were issued in 2007. We challenged both of those under NEPA. And essentially, what we contend the United States should have done and it did not do, which was first, address the extent to which the Navajo Nation needs water from the Colorado River to meet the homeland purposes of the reservation. Secondly, they should have analyzed or considered the ways in which that water might be obtained to meet those needs. And third, they should have examined the extent to which both the shortage pipelines and the surplus pipelines potentially affected the ability to secure that water supply. As I understood what the district court assumed, it is that you don't have any adjudicated water rights. If you ever have an adjudicated water rights, they will be superior to all of these other water rights. And therefore, what happens with regard to these two decisions really could be affected. And so my question is, why is this? What is the causation mechanism that you're arguing? And as best I can tell, it was some notion that the other entities within the states would become reliant on the excess water or the excess water created to counter the shortage. And that would somehow in a political sense, I guess, interfere with the open jurisdiction of the Navajo rights. I mean, is that basically your argument? Yes. All right. That's a tough one. I mean, it's awfully vague. And I mean, the answer is, well, so what? I mean, if they become reliant and you get rights, they don't get rights. So too bad for them. I don't want to belabor the reliance argument, because it's talked about a lot in the briefs. As a practical matter, as a political matter, we think anything that the federal defendants can do to cement into place the status quo in which there's no identification of a water supply. And it's clearly a water right. A water supply for the Navajo Nation causes harm to Navajos. Another one I wanted to ask you, which is to what degree and in what specific mechanism is your standing or are you arguing that your standing is predicated on that?  you need the water. And that wasn't taken into account. But how could this decision affect that? OK. To raise the United States in a different proceeding through the Bureau of Reclamation in the North Central Arizona Water Supply Study identified that Navajo has a need for water from the Colorado River. That was given. And that was in 2007. There was even no attention in the course of the EIS process, obviously. And my understanding is the government can reallocate the water from the Arizona versus Colorado to create it. So the question is whether there's something about, for example, if Arizona gets more water, do you get more water? Is that the argument? Why is the question? OK. There's two separate things that the government did. One in the context of the surplus criteria. EIA had their guidelines, EIS. And another in the 2007 EIS thing that led to the record of decision extending the surplus guidelines and the shortage guidelines. And there's two separate things that they did in the surplus guidelines. They looked at the different rights that different tribes actually had, the tribes that have an entitlement to water. And they looked at the senior rights of the tribes with decrees in Arizona versus California. They broke out the Cocopah tribe as a reserved right. And that is not protected as a present perfected right. Looked at the impact to them of that particular right. Looked at the rights of the Central Arizona tribes, tribes that received water through the allocation to the Central Arizona project. How are the efficiencies? Navajo does not. Navajo does not. Navajo does not have an entitlement in the sense of the way that term has been used. It does not have a decreed right. No, but my understanding is it's wrong. The Arizona project, the equal contract was into the water. Yes. But Navajo doesn't. We do not at the moment. And there's some prohibitions in the Arizona Water Supplements Act against obtaining the requirement for a settlement of the tribe's rights before more water can be allocated in that sense. And so the second thing is that you can't get water from the Central Arizona project until you have rights. I'm sorry. You can't get water from the Central Arizona project until you have adjudicated rights. No, you don't have to have adjudicated rights. You have to have a congressionally approved settlement up until 2030. All right. But you could walk it down and see if there was water. No, but the secretary could reserve water in anticipation of a future settlement for the tribe. The other thing that the United States did in 2007, and so while they looked at how, let me go back for a minute to the surplus EIS. So they looked at the different characteristics of those rights, looked at how they might be affected by the surplus water funds, and reached some conclusions. They could do the same thing with regards to Navajo, although they would have to identify potential sources of water and try to make some analysis of the way in which water would be secured for Navajo. The second thing that they did was in connection with the shortage guidelines, which I think is very telling, which is they looked at Arizona's allocation in particular and how under the different alternatives that have been proposed, how those different alternatives would affect when there was surplus water, when there was shortage water, when there would be a normal supply of water. So if they'd done the first two steps, the first two steps of identifying Navajo's need, and secondly, considering how that need might be met with a water supply from a variety of different places where they might also include purchasing water, then they could look at how these different guidelines might affect the water supply available to meet Navajo needs. Navajo stood out because, unlike the other tribes, we don't have adjudicated rights. Part of our concern is, and in some ways it's racist to look we're standing here  It's obviously a significant issue on the river, but the question of how those needs get met, the government didn't address in the course of this process. Do you have comments in the record which focus, as you're focusing now, and not on the question of the reliance? The comments in particular with regards to the shortage criteria in 2007, there's an extensive letter from the Navajo Nation in 2006 that it says, it asks the United States Bureau of Reclamation to look at the needs of the Navajo Nation. And the response was, which we think is inadequate, the response was, it won't affect any adjudicated rights we get in the future. We agree, they can't affect legal attributes of any watershed need we get, but that's a much different question than whether or not... But it was clear that you were asking them to consider, essentially, where are we going to get water, are we going to need water? Yes. Not because we have any right to it, or anything, but because we need water. Right. And that's the same thing that the federal defendants did in the context of the North Central Arizona Water Supply Study, which is a part of the record, where they looked at Navajo's needs and ascertained, in this particular case, that what I would call native water, not Colorado River water, would not be sufficient to meet Navajo's needs. But that's not discussed in the context of these guidelines. And at the same time, of course, what is used throughout this particular discussion in the briefs is recognition that what the federal defendants are doing is providing to the other users on the river, and this is what they say they do, both the shortage and the surplus guidelines, predictability, certainty, reliability, all of which were the key goals for Navajo in this record. But isn't that right, that the only way they could actually literally take the 6.2, this piece of it, is by how the guidelines treat, essentially, Arizona? Yes. Yes, but it's not clear. It's not clear and we can't predict without that analysis. Of course, what we're asserting is a procedural injury. You can say I'm using that one more time. I would like you to answer the fiduciary duty question. Oh, good, sorry. I would like you to answer the fiduciary duty question. Okay. So that's the essence of your argument there. But it's essentially in deciding what Arizona guide you should have taken into account our problems. Yes, exactly. That's the short version. That's the short version. It's similar to an issue that was mentioned earlier. If you're not at the table, you may be on the menu. So on the fiduciary duty, I think our brief covers the sovereign immunity question quite well. We don't see the conflict between Gallo-Capitol, and this is on sovereign immunity, between Gallo-Capitol and Presbyterian Church. We think the second sentence of 702 waives sovereign immunity. I think the second sentence of 702, So there is a paragraph in the district court's order that deals with the merits of the fiduciary duty question. When he decided the 60-day motion, he essentially didn't respond to your motion to amend. I think you're honest to that because you said you don't have jurisdiction anyway. So is this essentially about the motion to amend? It's essentially to avoid with you about the jurisdiction amendment, which is 60 days again. Well, we think that the merits of the breach of trust question, if we can pass the sovereign immunity question, that the merits of the breach of trust question should be addressed in the first instance, and that doesn't matter. What we do think, and we do claim, we don't claim a simple common law breach of trust. We look at essentially three organic statutes to get organic documents to get our breach of trust. One is the original treaty establishing the reservation as a permanent home for the Navajo people. The second is the 1922 compact, which has a provision which today states nothing in this compact or words to this effect shall affect the obligations of the United States to Indian tribes. It was originally worded by then-Secretary Hoover as nothing in this compact shall affect the rights of Indian tribes. What the federal defendants essentially did in the EIS is to look instead at the rights, not at what their obligations were to the Navajos. Is there a fiduciary duty claim? That's the thing we want to do in there. In hopeful of words, i.e., the government has fiduciary duty to seek to adjudicate our rights in the Colorado River. Now they haven't done it for over three years, and now it's time to do it. Or is it just about these? Or are we going back to the way in which they did with fiduciary duty with regard to these decisions? It's with regards to their general management of the Colorado River. It is not that they must adjudicate these rights. It's that they must do, and our claim gets additional flavor from the trustful format of which we cited in our brief as well as the fact that in Arizona versus California, the United States objected successfully to tribal and to the Navajo Nation's intervention. What their management did is that they, I understand, they don't adjudicate their rights, but they can claim self-adjudicated rights. And it hasn't been done so with regard to the little Colorado River and the San Juan River. So is that what you're saying? No, what we're saying for the breach of trust is they may not manage the Colorado River in a way in which it adversely affects their obligations to the Navajo Nation. So we're back to the other problem then, which is how are they doing that other than on this reliance theory? Well, they are, one, not assessing the need at all, not assessing the needs of the Navajo Nation or taking steps to see that those needs are met in any way, shape, or form from the Colorado River, despite the fact that in the more central study they identified such needs. And so the question is what can they do to protect the nation's need? And the first thing is to identify a war zone. But what about the winter rights? So you're not relying on the winter rights for this adjudication? We don't have to at least have a need to determine the winter rights. We're not trying to say this court should compel them to adjudicate farm rights. We would hope that if they take the steps that we look at, that they might well conclude that they should do that, that all we're saying is they should take this three-step process. What are the needs? How can you secure water to meet those needs? And in our management activities, are we infringing on? But without the winter rights, it doesn't seem that you can possibly meet the sort of duty plus standards that is the best I can tell. The only one that sits in Egypt has some specific obligation. The specific obligation would have to run from a combination of the only 3D and the 1922 statute and the winter rights, on top of which you could say that if you have the right to land, that you have a right to the border on the land, as it turns to be the land workable. Otherwise, what have you done? But I think they have a lot of opportunities to secure water. And the first step would be to identify the fiduciary duty. I think the fiduciary duty arises from what you have explained, which is they promised that Navajo Nation, they would develop a permanent homeland for them, which in this country plainly requires water. They said when they passed the 1922 compact, which underlies most of these management decisions, that we are not going to affect the obligations of the United States to Indian tribes, which in my view is much different than not affecting the rights of Indian tribes. They have an obligation to make this a permanent homeland. But that doesn't mean creating it. I mean, I said it's one of the obligations. It doesn't create any obligations. It just doesn't. But they should be able to do things that are detrimental to securing that water supply. I think they should do something affirmative to securing the water supply. You are right. It's a very helpful argument. I will give you a couple minutes to rebuttal. Thank you. Elizabeth M. Pearson to the United States. I will be sharing my time counsel for the appellees who will argue for five minutes. And with me at counsel table is Robert Snow from the Interior Department, who will help me out if I can't answer your questions.  Elizabeth M. Pearson to the United States, The district court's dismissal of the complaint in this case. The district court determined that no cognizable injury, in fact, was alleged on the face of the complaint here, and that conclusion was correct. As counsel for the tribe has explained today, the injury that is alleged here is a vague, political kind of injury. Well, actually, it's not what he wants to talk about. This is what I was thinking about the case. Both the district court opinion and your brief insist that the only interest they're forwarding is an interest in protecting any ultimate water rights, which rights they may have. This political kind of reliance thing. But Mr. Holbrook got up today and said, well, let's put that aside. And I read the brief, and he complained carefully, and he does repeat rights and needs all the way through. And it seems to me to encompass, although not all the way through, certainly the intention that he's making now is that whether we have a right to water or not, we have a need to look for water. And that should have been taken into account in his two decisions. If nowhere, do you brief that, or does the district court do it? The way that they address that below and here, I think, is that the United States, that the Bureau of Arbitration, had an obligation to perform a particular analysis in order adequately to perform an EPA analysis, so that that analysis had to take into account the needs and possible supplies of water for the Navajo Reservation, which is effectively a quantification of their reserved water right now. Well, I'm going to say it's not a reserved water right. Whether it's a reserved water right or not reserved water right, we need some water. I understand that now, Your Honor, but I don't read the complaint to say that. I understood it. The complaint asserts that in order to do an appropriate EPA analysis, the Bureau of Reclamation needed to know what water Navajo might someday need, and actually what the Bureau of Reclamation was doing in its EPA analysis was determining what current uses existed in order to determine whether certain adjustments to the operation of the reservoirs would affect those years away, while ensuring the integrity of the overall water supply in the river. It wasn't looking to see whether future changes, but it is, for example, as I understand it, the net result is that there was a plan for how Arizona, Colorado, and their third state, Nevada, were going to get water at times in terms of surplus or shortage. Meaning, and I gather California was using more water than it was supposed to, and so there were various triggers and so on. The net result being that Arizona would get more or less water depending on who gets this. And I gather their argument is, although the negatives are not quite there, that if Arizona gets more water, then we get more water. At least that's what they're saying today. And so, well then at least we understand it's going to be more water. So we have an interest, but it should have been taken into account. Given how badly we need the water, and how this is all giving up, it should have been taken into account. And that just misunderstands the nature of the guidelines and the nature of the effects of our big study. Because all of the allocations that are mandatory will be met in any event, and these guidelines were intended, the first set, the 2001 set, was intended to create objective triggers when a surplus would be available each year, the bureau has to provide a report of past years' operations and predict following years. And that had been ad hoc as to whether, as to what was studied and what determined, what triggered the prediction that there would be surplus, and this set objective measures for that. But what those triggers are, are elevations in the reservoirs. They're not about Arizona getting more water, or the elevation of the water in the reservoirs. So that's just as to whether or not in the upcoming year, it is probable that surplus water will be available for delivery, and over the years that has been true. Surplus delivery is not new. These were not intended to make available newly surplus deliveries, and it's only meant to find objective criteria for determining when and how much surplus water. Now you know that surplus water is going to be delivered. I'm sorry. Now you know that surplus water is going to be delivered. No, Your Honor. It's delivered according to existing contracts. That's how it works. And that's why if Navajo has a senior right to receive water, it can be affected by these kinds of changes. Okay. And this is an even simpler thing. Counsel, let's go back and interject a quick question. It would help me understand these issues a bit. Is the NEPA claim totally independent from the breach of fiduciary duty claims? Or stated another way, if, for example, we concluded that the ruling on NEPA should be affirmed, that the tribe didn't have articles freestanding to show injury in fact, what does that do to the breach of fiduciary claim? Or could there still be standing for that to proceed? Your Honor, I believe that the injury alleged is not different between the two, but to the extent that the count that alleges only a breach of fiduciary duty might be unrelated to the agency action alleged, which they now say it might be, it is not necessary that the court understand the injury allegations to be identical for both because the breach of fiduciary duty interest here, which I think is really the only interest here, I think it's being shoehorned into a NEPA analysis rubric. But be that as it may, it is legally almost certainly entirely separate, yes. And with respect to the breach of fiduciary duty, with respect to the breach of fiduciary duty claim, Navajo's reply brief goes at great length into their claim and the validity of it under this court's law, but it doesn't even mention the Supreme Court's 2011 Niagara Apache case in which the Supreme Court held that any fiduciary duty can be enforced against the United States only in accordance with congressional language. And so unless Congress has expressly required that in the analysis. But, I mean, the district court, as I said before, had like paragraphs on the merits of the fiduciary duty claim, but it seemed much more persuaded by the jurisdictional question of the APA and then when they filed for relief to men, essentially, as I understood what he said, was, well, there's no point in men because there's no jurisdiction, so it never really got into whether the proposed amendments would ensure anything with regards to fiduciary duty. Does that answer it so far? Well, it was a close judgment motion. I understand. And completely dismissed without prejudice. So meeting the standards for relieving from that on that motion was enough. So are you essentially saying that the jurisdictional argument, the decision was fairly shaky in that motion? By no means, Your Honor. By no means. The claim to action that's at issue here, which is simply some technical adjustments to the management of the. . . Well, as you yourself said, the fiduciary duty claim may be broader than that. I mean, there's a threshold question of whether or not Section 702 of the APA waives sovereign immunity for a breach of the fiduciary duty claim in general. And I gather your argument is it doesn't, but I want to hear what you can say about that. But I also want to know whether, if we thought otherwise, would it be the judiciary manager of the district court in the fiduciary duty claim? Your Honor, with respect to the 702 question, it is our position that it doesn't. And that further, the district court's determination that 702 is limited by 704 is consistent with this court's precedent. So reversing the court on that, on the waiver issue, Well, it's not consistent. I mean, there was this one case that says it, but in a constitution which it appears that the claim really was essentially an APA claim. And just to cite the earlier case, there's a later case which was vacated, which does a pretty good job of reconciling the two. And why shouldn't we repeat what we say in the vacated opinion? Well, in that case, Your Honor, it is worth perhaps using the rest of my short amount of time to address the fact that there is no cause of action for this breach of fiduciary duty, because this has been under Hickory and Apache. There is no statutory basis for the claim. We do not deny that the United States has a duty to ensure that the Navajo Nation's reservation is protected, and we are pursuing the right that has been recognized to the United States. Well, what exactly do you think? And I wasn't clear about this. Does the statutory duty have to say that the United States has fiduciary duty as to this, or can it say that there are the fiduciary duty obligations and backdrop such that statutory treaty interests are not clear enough? There is fiduciary duty, but exactly in case you are interested. Under the Supreme Court's decision in Hickory and Apache, the United States' exercise of any trust responsibility is a part of Congress's plenary authority in dealing with Indian tribes, and the particular obligations that the United States has under the trust duty, therefore, are those duties that Congress has accepted by statute. So in this case, there is no statute that says that the United States needs to assess the needs and potential uses of water by the reservation. You said you're not convinced that there is fiduciary duty. Correct. Question on the case. The issue is whether there's jurisdiction to enforce any duty. The United States recognizes a moral duty to protect the resources of the tribes, and what we're doing in that regard at this time is litigating the United States water rights bill in the Colorado River, and that litigation has gone on. We've also, as this Court is well aware, made every effort to do to ensure that federal courts overturn these rights unsuccessfully. There isn't a question that the United States has shirked the duty to attempt to secure these resources. Counsel, if the Supreme Court case because it's Arizona v. California is an ongoing case, why isn't there a petition that the Supreme Court passing it resolve the rights of the Navajo Nation to water in the Colorado River? At this time, Your Honor, there is ongoing effort to determine the scope, the quantity, all of the details, the needs of the Nation's water in the context of the Little Colorado River, which is the likeliest source for use on the reservation. We don't contest that there may be a need for additional water and that that additional water may need to come from the Colorado River, but at this time it would be impossible to assert a particular right in that water because it can't be known the extent of any needs from the Colorado, and of course the Colorado is in the Grand Canyon, which makes it a great deal more complicated to use, and Navajo currently does not have any infrastructure for using it. So those issues will be developed over time, but the process has been developed by the courts, and that process is we vitigate on the tribe's behalf in state general adjudications, and my... Okay, Your Honor, I was talking to the Supreme Court here. Yes, Your Honor. Good morning. My name's Lisa Korth. My name's Don Meyer, and I represent the state of Arizona, and I'm here today to argue on behalf of the intervenors. And in my limited time, I'd like to quickly touch on three important points. The first is the critical nature of the Colorado River water supply to the intervenors, and there are many, many millions of water customers, and we don't know that. Is the Navajo Nation a water customer in Arizona? They are not currently, and I think we're going to stop for a moment and clarify that. Now, we did file an Arizona project and covered that, but what are they getting for water? I don't understand. If they're not getting water from anybody in Arizona, where are they getting water from? Well, they are, in fact, getting water from Sosatown Reservations, and I'm not going to try to address whether or not that satisfies their full need. The question of need that you raised earlier, the problem, I mean, just all right now, I think there's a few flaws in the Navajo Nation's claim here in terms of standing, and the first is that they made up for an assertive need in a legal argument they could raise that is a winter's nocturne argument. All right, let's wash that out, okay? He basically didn't defend that here, and it seems quite problematical. Wash it out. Their other argument, which is the community thing, which is essentially, wherever it comes from, we need some water. As I understand it, you're saying not, and this is why you're interested in it, where we're going to have to get the water from is Arizona, so we have some interest in the way these rules deal with Arizona. You're saying it doesn't matter how much water Arizona comes, it's not really a Navajo Nation, is that what you're saying? No, I'm not saying that at all. What I'm saying is, well, bear with me because we have a little bit to lose. The Navajo Nation has decided they need water, and they may assert that they haven't yet in this proper forum, which is the United States Supreme Court, they have yet to assert a need as to the Colorado River. The other source is they have been actively adjudicating water right claims on the Little Colorado River, which is a separate, completely separate source of water. They've got a settlement on the Sonoma River in New Mexico. As I understand it, they've recently enacted their racist holding agreement in Utah. They claim that, in addition to that, they need water from the mainstay of the Lower Colorado River. In order to execute on that need, they would need to successfully petition the United States Supreme Court to reopen the river. I understand their argument. I think another point is that they're saying, even if we don't have any rights, even if the United States Supreme Court doesn't give us any rights, the fact is, you know, just like Mrs. Jones down the street, we need some water, except we're very big and we don't have water. And in some fashion, this gets favor. And Mrs. Peters, as you say, she doesn't even have a job. And these sets of decisions are going to determine not whether we have water we have a right to, but whether we get water that we can contract for or otherwise retain. That's my understanding of what they're saying. Well, let me come at this maybe from a different angle. I think the clary fault here is that there's too many trees and they have too high a rate of interest. The first element of the standing test. Well, I think I'm Mrs. Jones and I live on a street, and I can't get new water because of a decision that's being made by anything that's true, I don't know what the name of it is, by the United States managing Colorado River water. So it's somehow spurring my street from not getting water. I assume she has an interest. Well, she has no right to water. She has a problem. She doesn't have any water. And if things were done differently, she'd have water. I think the critical flaw there is if things were done differently, the programs here, the surplus guidelines, the shortage guidelines, do not allocate more water to anyone, neither to Arizona nor any of the other interveners, nor to the Navajo Nation. What they do is they help existing users manage their water more efficiently and effectively. The Navajo Nation itself acknowledges that in its briefing. There isn't any change in the allocations as a result of this program, nor could there be. And I think you said it earlier, the Bureau of Reclamation has no power to change water right allocations on this report. I just did not understand this thing. My understanding was that as a net result, how much water it does make a difference. The only thing that these programs can do is to change. For example, I gather if it's a surplus, Arizona gets more water. And if it's not a surplus, Arizona gets less water. Not qualitatively. In other words, it isn't a relative question. As it long as it stays. But still, they need more water or less water. That is true. But it's true for this reason. The decree in 1963 divided up all of the water in the lower Colorado River. It's the lower Colorado River Main Street. Everything, including any surplus that might be available, has been decreed a certain percentage goes to Arizona, a certain percentage to California, and so on. So that cannot be changed by these programs. That's the allocation. But it isn't a question of whether it's infiltrated as a surplus. And everybody's going to get more water. Oh, and that to me is the other flyer. Where is the harm in there being more water in the system? Whether or not an outlaw today has a claim that they succeed someday in acquiring a decreed right to water, if there's more water in the system, and it's unsuited that these programs satisfy that. Actually, the water rights are good. And I was trying to get away from that. Okay, I'm sorry. If there's more water. Well, to me, this goes to the element of decreed harm. And certainly, the Spokio case says that a mere procedural violation without harm is insufficient. This court's – Spokio is modified. Does it need the standing cases? I'm not arguing that. But if you go to an AP case, this court, the nuclear – I forget the name – the Nuclear Research Service, I think it is, case absolutely found that without harm there is not standing. And I think that's the situation here. More water in the system can't possibly harm an outlaw. It can only help them. If there's less water in the system, there's more harm there. So this is going to affect whether there's more water in the system or less water in the system. It's going to have the best impact of having less water in the system. All this does is allow parties to potentially bring in additional water through conservation or importation. Okay. We're out of time. Thank you very much as well. You may have a couple minutes. I want to focus in on – unless the court has particular questions. I want to focus in on the trust responsibility question because I think that overlaps both of these particular issues. If you look at, for example, the 1994 Bureau of Reclamation, questions and answers about preparing NEPA statements, it's very clear that special attention is to be paid to trust assets held by the United States. And if you look at the two EISs, you see that looking at trust assets, not just water rights, trust assets are a critical part of the NEPA analysis. I'm having a hard time understanding what the causation mechanism is here. We're now told that Navajo Nation is not entitled to any of the central and capital water and currently doesn't have any contracts, I guess, with any water allocated to Arizona. Is that right? That's correct. So what is the mechanism by which – and we're also told that these guidelines are not going to affect the allocation of water. I'm not sure I fully understand that, but is that correct? I think they do not affect the allocation. They affect when and where water is available. So can you give me a line of causation or a contention leaving out the water rights as to how these guidelines, if they were different, would get Navajo Nation's water needs? I'm not going to say that they would get the Navajo Nation. I'm sorry, a theory, some theory. Our theory is the Navajo Nation needs water. The federal defendants have agreed to that. It is clear from looking at these horizontal impact statements that the when and where water is available under the different guidelines does affect different parties differently. There are different times under different guidelines. There are shortages at different times. There are surpluses at different times. But you're not getting the water that's allocated to Arizona anyway. So tell me how this is going to help. Unless the secretary identifies the water it's going to get for Navajo, it can't protect it with the water it needs for Navajo. So what it needs to do is look at the needs, which is done in different contexts, identify ways to secure that water, and then make sure that the guidelines do not adversely affect its ability to secure that water. And it does make a difference. They can't allocate the water to us, to Navajo, but they certainly can identify how they propose to secure it, and they can identify whether or not that task be made more difficult by these guidelines or less difficult. And the problem is when you start this sort of procedure. The short version is there's nothing to do with it. I know, but I'm sorry. I mean, what they're saying here as well is there's nothing to do with it. I can tell you right now, there's nothing to do with it. That's what they're saying. They're doing this because our bottom line is there's nothing to do with it. In fact, the California Institute of Water. That's essentially saying we don't have to look at this question. We don't have to identify it. And, therefore, because we haven't done what we're supposed to do in terms of identifying needs and in terms of identifying how we secure the water, your claim is too remote now. Well, that's not what we're thinking. That's not what this. It's like if you come in, if they're doing a forest plan and you come in and say, worry about our water. And they say, well, we're not worrying about your water today. We're worrying about a forest plan. And essentially that's what they're saying. It's just not what this is about. There's no way it's going to be waterless water. I guess I agree it's not going to get us water. What I don't agree with is that they can say that they know that it's not going to harm their ability to gain this water. That's the question. Whether they have to analyze it. If we're talking about the NEPA analysis, they have to analyze it in the context of their trust obligation, which is to secure a water supply for the Navajo Nation. They seem to admit that. Thank you very much. You both were very helpful in a very complicated and interesting case. In the case of Navajo Nation versus the Department of the Interior, it's been and will go. The last case, no, not the last case. Actually, the last case today, which is in the beautiful red cherry out of California.
judges: Gould, Berzon, Garbis